**Affirmed and Opinion filed July 2, 2013.**



In the

# Fourteenth Court of Appeals

---

### NO. 14-12-00441-CR

---

**DAVID SHANE WEST, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 405TH District Court**
**Galveston County, Texas**
**Trial Court Cause No. 10CR2876**

---

## O P I N I O N

Appellant David Shane West was convicted of aggravated kidnapping. Appellant attacks his conviction and sentence in five issues on appeal, arguing: (1) the evidence is legally insufficient to support his conviction; (2) the evidence is factually insufficient to support his conviction; (3) the trial court erred by refusing to instruct the jury on the defense of "safe place" release during appellant's punishment phase; (4) the trial court erred in permitting the interpreter to translate

for the complainant without first complying with article 38.30 of the Texas Code of Criminal Procedure and rule 604 of the Texas Rules of Evidence, thus violating appellant's confrontation clause rights; and (5) the trial court erred in overruling appellant's hearsay and confrontation clause objections to the admission of a 911 recording. We affirm.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Appellant was charged with the felony offense of aggravated kidnapping with intent to violate or sexually abuse the complainant K.R., alleged to have been committed on or about September 18, 2010.

At trial, K.R. testified that on the night of September 17, 2010, she had gone out to a night club in Galveston with her sister, her sister's boyfriend, and a friend of K.R. They left the club at 2:00 a.m. in K.R.'s vehicle,[1] went to "buy food," and drove to K.R.'s sister's friend's apartment on 72nd Street. K.R. did not want to stay at the apartment, but her sister refused to return K.R.'s keys to her, and so K.R. left on foot, walking toward 61st Street. K.R. was barefoot because her shoes were in her locked vehicle. K.R. walked to a gas station, where she used a pay phone to call her boyfriend to pick her up. K.R.'s boyfriend did not answer. At that point, an "old man in a truck" offered K.R. a ride and drove her to her house on 45th Street. But the door was locked, K.R.'s sister had the keys, and no one was home. K.R. left again on foot to try to obtain some change at a store down 45th Street in order to make another phone call, but the store was closed.

K.R. was set to "return home" when appellant showed up in his car and asked her whether she was okay. According to K.R., she did not know appellant, did not take any money from him, did not want to get into his car, and did not want

---

[1] K.R.'s sister's boyfriend drove the group from the club to K.R.'s sister's friend's apartment.

2

to have sex with him. After K.R. told appellant that "everything was okay," appellant "hugged" or "grabbed" K.R., put her in his car, and started driving toward 4th Street. Appellant drove down the Seawall, running several red lights. Eventually, appellant stopped at a red light. At that time, K.R. opened the car door and attempted to get out, but appellant "grabbed" her by her shorts. As a result, K.R. fell, injuring her shoulder and foot. K.R. stood back up and ran to another car, also waiting at the red light. K.R. asked the occupants of that other car "for help," but they did not help her. Appellant pursued K.R. on foot, grabbed her again, and put her back in his car. K.R. did not want to get back in appellant's car.

At this point, the driver inside the car that K.R. had run to called 9-1-1. Appellant continued driving "to the beach," and K.R. tried to shift the car's gear into park in an attempt to stop the car. Appellant "got mad and told [K.R.] not to do that," and continued driving "to the beach." When they arrived at the beach, appellant exited the car and opened K.R.'s car door. K.R. did not know exactly where they were, but it was a "very dark" part of the beach. K.R. exited appellant's car. Appellant then ordered K.R. to remove her clothes. K.R. refused, and appellant removed her clothes, including her panties. Appellant then told K.R. to "lay on the ground"; appellant then lowered his pants, restrained K.R.'s wrists, "started touching [her] and started having sex with [her]," and ultimately put his penis in her vagina. K.R. was crying. Appellant did not wear a condom and did not ejaculate inside K.R. According to K.R., appellant stopped because "[c]ars were passing by." Appellant stood, pulled up his pants, and ordered K.R. to get dressed. After K.R. got up from the ground and redressed, appellant "grabbed [her] by [her] hand," took her toward the water, and threatened to drown her "so [she] wouldn't say anything." Appellant let go of K.R. when "[a] car passed by." K.R. stayed by the water; appellant left and then returned, told K.R. that his car

3

was stuck, "grabbed" K.R.'s hand, put her in the car, and told her to step on the accelerator while he pushed. According to K.R., she did not get back in appellant's car voluntarily. A white SUV passed by, and appellant asked the occupants for help. K.R. exited the car and attempted to ask them for help, but she did not know how to tell them "what was happening." The occupants of the SUV did not help K.R. but tried unsuccessfully to "get the car out." Then the SUV drove away, and K.R. returned to appellant's car. Appellant continued trying to free his car. Then appellant and K.R. saw a white light approaching—appellant told K.R. that it was the police and admonished her not to say anything, except that they were friends. When police arrived, K.R. exited appellant's car and ran to the police. As she ran to them, K.R. thought "[t]hat [she] was going to be okay."

Officers Weems and Chambers of the Galveston Police Department were just finishing up an unrelated patrol call in the Strand district when they heard the radio dispatcher put out a "female-in-distress" call that came in from the Seawall. The officers were the closest in proximity, so they responded to the call. While checking the area on foot, the officers noticed brake lights in the distance on the dark beach. They returned to their vehicle, drove closer, and observed a white SUV leaving. They also saw another vehicle that was flashing its headlights so they headed toward it. The officers stopped near a vehicle that was "[h]igh-centered on the culvert," and "[o]ut of the darkness came a female . . . screaming and crying, running straight at" Weems. The female—K.R.—"latched" onto the officers. K.R. was "so scared," "terrified," "obviously frantic," and "distraught." K.R. told the officers, "thank you," asked the officers for "help" and "ayuda," and stated, "Get me away from him." Appellant approached Weems and was detained.

Despite the language barrier,[2] K.R. was able to communicate to police that

---

[2] K.R.'s primary language is Spanish, although she understands and speaks some English.

4

appellant had taken K.R. against her will, forced K.R. to go down to the beach, and sexually assaulted her. Police located a pair of torn panties at the scene; K.R. identified them as hers. A crime scene investigator identified K.R.'s thumbprint on the gear shifter of appellant's car. An EMS paramedic dispatched to the scene treated K.R. for an abraded left ankle. K.R. reported to the paramedic that K.R. was walking when she "got pulled into [appellant's] car, taken out to the east end" and was "forcibly attacked" and sexually assaulted.

A Sexual Assault Nurse Examiner (SANE) examined K.R. at the hospital. The SANE noted various abrasions, including on K.R.'s left arm and left ankle. K.R. reported to the SANE that appellant grabbed her, drove her to beach, grabbed and pushed her, "abused" and "took advantage of" her by penetrating her vagina with his penis. The SANE interpreted what K.R. described as a sexual assault. To a "reasonable degree of scientific certainty," forensic DNA evidence showed appellant as the source of sperm from the vaginal swab taken from K.R. during the SANE exam. K.R. also reported to the SANE consistent details about how appellant tried to "take [her] to sea"; appellant ordered K.R. to help him free his car after it got "stuck"; the occupants of another vehicle refused to help K.R. and could not free appellant's car; appellant told K.R. not to say anything when they saw a police vehicle approaching; and K.R. exited appellant's car and ran to the police.

Police transported appellant to the station. After informing appellant of his *Miranda* rights and obtaining appellant's written waiver, Chambers interviewed appellant. According to appellant's videotaped statement, a girl who told him her name was "Felicia" approached appellant and his friend "James" on the Seawall. The girl—K.R.—asked appellant for money and initially declined appellant's offer of a ride. Appellant also claims K.R. made out with him on the Seawall and asked

him if he wanted to "f**k" her. K.R. ultimately accepted the ride, and appellant drove them down the Seawall toward 4th Street. As they were driving, K.R. claimed to need to "pee." Appellant decided to take K.R. to some porta-toilets on Stewart Beach. Along the way, K.R. started to "freak out" and grabbed the steering wheel, so appellant became angry and screamed at her. Then K.R. jumped out of the car. Appellant admitted grabbing K.R. but claimed he did so because cars were coming. Appellant indicated that K.R. fell. Appellant asked the driver of another vehicle if he would take K.R. home, but the car drove off. Appellant could not answer why he drove to East Beach. Appellant and K.R. talked for a while, then K.R. started to "freak out" again, so appellant let her drive and she drove appellant's car into the ditch. According to appellant, when they got to the beach, K.R., not appellant, took K.R.'s clothes off. Appellant claimed that he did not restrain K.R. They started having consensual sex, but then K.R. wanted to stop, and appellant complied. K.R. willingly got back into appellant's car. A truck came by and offered to help them free appellant's car. The truck passenger told appellant that the police were out and asked whether they were looking for appellant; appellant told them no. Appellant conceded K.R. may have been drunk and he would apologize if he took advantage of her state. Appellant also said K.R. was lying if she accused him of rape.

The jury convicted appellant of aggravated kidnapping with the intent to commit sexual assault.

Appellant testified during his punishment phase. Appellant denied assaulting a woman who testified during his punishment phase. Appellant denied restraining and sexually assaulting K.R., essentially repeating the same story he told police in his statement. Appellant further claimed for the first time that K.R. jumped out and ran at the red light because she had taken $37 from him; appellant

6

grabbed her by the shoulders to "snatch" his money back. Appellant stated he did not prevent K.R. from leaving and allowed her to drive his car after they had consensual sex. Appellant claimed that K.R. proceeded to high-center his car on the curb. Appellant stated that he did not hold back K.R. from speaking to the occupants of the white SUV or police when they arrived, nor did he say anything to threaten her. Appellant admitted he smoked weed and crack cocaine that night. Appellant claimed that K.R. could have left at any time and police did not rescue her that night.

Appellant requested a "safe place" release instruction to the punishment jury charge, but the trial court denied his request. The jury sentenced appellant to 55 years' confinement.

Appellant presents five issues on appeal. In his first two issues, appellant argues that the evidence is legally and factually insufficient to support the jury's guilty verdict. Third, appellant contends that the trial court erred in denying his "safe place" release instruction. Fourth, appellant argues that the trial court erred by permitting the interpreter to translate K.R.'s testimony without first complying on the record with the Code of Criminal Procedure and the Rules of Evidence, which violated his confrontation rights. Finally, appellant argues that the trial court erred by overruling his hearsay and confrontation clause objections and admitting the 9-1-1 tape.

## II.     ANALYSIS

### A. Legal sufficiency of the evidence

Appellant first argues the legal insufficiency of the evidence to support his conviction for aggravated kidnapping—specifically, it would not be reasonable for a rational jury to find that appellant abducted K.R. and that appellant intended to

commit sexual assault beyond a reasonable doubt.

### 1. Applicable law and standard of review

Appellant was charged with committing the felony offense of aggravated kidnapping: that he, on or about September 18, 2010, with the intent to violate or abuse K.R. sexually, intentionally or knowingly abducted K.R. by restricting her movements without her consent, so as to interfere substantially with her liberty, by confining her, with the intent to prevent her liberation, by secreting or holding her in a place where she was not likely to be found. The guilt/innocence jury charge tracked appellant's indictment.

One way in which a person commits aggravated kidnapping is "if he intentionally or knowingly abducts another person with the intent to . . . violate or abuse him sexually." TEX. PEN. CODE ANN. § 20.04(a)(4) (West 2011). For purposes of chapter 20, the meaning of "abduct" includes "to restrain a person with intent to prevent his liberation by: . . . secreting or holding him in a place where he is not likely to be found." *Id.* § 20.01(2). "Restraint" is the actus reus requirement of "abduction," while the specific intent to prevent liberation is the mens rea requirement. *Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009). To "restrain" means:

> to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, . . . by confining the person. Restraint is "without consent" if it is accomplished by: (A) force, intimidation, or deception[.]

*Id.* § 20.01(1).

In evaluating the legal sufficiency of the evidence, we must view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a

8

reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Laster*, 275 S.W.3d at 517. This standard applies equally to circumstantial and direct evidence. *Laster*, 275 S.W.3d at 517–18. Because the factfinder views the evidence first-hand, the factfinder is in the best position to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from the evidence. *See Jackson*, 443 U.S. at 319; *Laster*, 275 S.W.3d at 517 ("[U]nlike the factfinder—who can observe facial expressions and hear voice inflections first-hand—an appellate court is limited to the cold record."). We presume that the factfinder resolved any conflicts in favor of the verdict and must defer to that resolution, as long as it is rational. *Jackson*, 443 U.S. at 326. "After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element." *Laster*, 275 S.W.3d at 517.

### 2. The evidence is legally sufficient to show that appellant restrained K.R.

Appellant argues that K.R.'s account "leaves in serious doubt whether restraint of any kind, let alone 'force,' was used." Appellant asserts that K.R.'s presence in his car was, at most, only a slight interference with her freedom and was not without her consent because the State did not refute K.R.'s "crude overture" to appellant at the Seawall; K.R. could not describe the degree of force appellant used; K.R.'s request for help on the beach only concerned getting appellant's car unstuck; and K.R. did not flee after the strangers left, but instead returned to appellant's car. We conclude a rational jury reasonably could have found that appellant substantially interfered with K.R.'s liberty without her consent by confining her to meet the restraint element of abduction.

There is not one particular way to prove restraint:

[T]here is nothing in the Texas statute that even suggests that it is

necessary for the State to prove that a defendant moved his victim a certain distance, or that he held him a specific length of time before he can be found guilty of kidnapping. In fact, we have consistently held that under the kidnapping statute, there is no specific time requirement for determining whether a restraint has taken place.

*Hines v. State*, 75 S.W.3d 444, 447-48 (Tex. Crim. App. 2002) (footnote omitted). Nor is there one particular way to prove confinement. *See Holmes v. State*, 873 S.W.2d 123, 126 (Tex. App.—Fort Worth 1994, no pet.) (explaining that "[c]onfining is not defined in the Penal Code or by case law; thus, we use its common meaning when reviewing the evidence," which may include shutting up, imprisoning, enclosing, detaining, relegating to certain limits, or trapping victim). Further, although the legislature did not intend for every crime involving interference with a victim's liberty to qualify as a kidnapping, "it is up to the jury to distinguish between those situations in which a substantial interference with the victim's liberty has taken place and those situations in which a slight interference has taken place." *Hines*, 75 S.W.3d at 448. We consider "all of the circumstances surrounding the offense" to determine whether the State has proven restraint. *Id.*

Contrary to appellant's contention, the State did introduce evidence to rebut appellant's version of events regarding appellant's and K.R.'s interaction on the Seawall prior to any "abduction." After being asked whether she said anything to appellant before he asked her if everything was okay, K.R. answered, "No. I don't remember saying anything." According to K.R., the only thing she said to appellant—after he asked her that question—was that she was okay. K.R. also testified that she did not want to accept a ride from appellant or get into his car, and that she did not want to have sex with him. Her testimony indicates that appellant placed K.R. in his car and sped away. Once appellant stopped, K.R. attempted to escape by jumping out and trying to alert another vehicle that she needed "help," but appellant continued to exercise his physical control over K.R.

10

by grabbing her and putting her back into his car. K.R. indicated that she did not want to return to appellant's car. K.R. again attempted to attempt escape by grabbing the gear shifter of appellant's car, but he stopped her and screamed at her. Police identified K.R.'s thumbprint on the shifter. Appellant then drove K.R. to a "very dark" and isolated area of the beach, where he ordered her to remove her clothes and, when she refused, removed them for her. Appellant pinned K.R. down by her wrists and penetrated her vagina with his penis. After this sexual act stopped, appellant then grabbed K.R. by the hand and started taking her to the water's edge, threatening to kill her. After he let go, returned to his car, and high-centered it, appellant again grabbed K.R.'s hand and put her back in his car, ordering her to help him free the vehicle. K.R. again did not want to return to appellant's car. K.R. asked the occupants of the white SUV for "help." After the white SUV left, when they saw the police vehicle approaching, appellant ordered K.R. to only say they were friends. When the police arrived, K.R. ran to them screaming and crying, and thinking that she finally was "okay."

Looking at all of this evidence in the light most favorable to the jury's verdict, we conclude a rational jury was free to find beyond a reasonable doubt that appellant restricted K.R.'s movements, so as to substantially interfere with her liberty, by confining her, and that this restraint was without K.R.'s consent because appellant accomplished it using force and intimidation. *See* TEX. PENAL CODE ANN. § 20.01(1). K.R. provided several, consistent details regarding the force used by appellant, including his repeated grabbing of her by the hand and arm, his pinning her down by her wrists during the sexual act on the beach, and his "placing" and "seating" her in his car—to initially force her into his car, then to force her back in after she attempted to escape, and finally to force her to help him

11

free the car.[3]  K.R.'s testimony thus was not uncertain about the essential facts of the restraint.[4]  The evidence also shows K.R. suffered abrasions on her arm and ankle due to appellant's force.

Although K.R. stated that all she remembered "was crying and asking for help" from the occupants of the white SUV, she further agreed that when she saw the SUV approaching, she became "excited there was someone there to save [her]."  Also, K.R. testified that she did not know precisely how to communicate "what was happening" to those she asked for help; several witnesses confirmed that K.R. spoke "broken" English.  While K.R. admitted that appellant did not force her back into the driver's seat after the white SUV left, at that point, K.R. was again alone on a dark, deserted beach with appellant who, up until then, had repeatedly forced her to perform actions against her will, had threatened to drown her, and had thwarted her attempts to escape.  *See Rios v. State*, 230 S.W.3d 252, 255 (Tex. App.—Waco 2007, pet. ref'd) (explaining that appellant's actions in threatening to kill victim and in thwarting her attempt to seek help "bound [her] to follow his command").  And after K.R. returned to appellant's car, he still was exerting his control over her—commanding her not to say anything to police. Thus, a rational factfinder reasonably could have inferred that appellant continued his restraint of K.R. up until police arrived.  *See Hines*, 75 S.W.3d at 448 (concluding that even where victim was in another room of bank, suspects "continued to maintain physical control over [her]"); *Rios*, 230 S.W.3d at 255.

---

[3] Appellant admitted grabbing K.R. by the shoulders after she jumped out of his car at the stop light, and also getting angry and screaming at her after, according to appellant, K.R. grabbed his steering wheel.

[4] Thus, appellant's reliance on *Redwine v. State* is misplaced because there "the witness acknowledged in his own testimony that he had a greater-than-reasonable doubt as to the essential facts."  *See* 305 S.W.3d 360, 367 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd).

12

**3. The evidence is legally sufficient to show that appellant intended to prevent K.R.'s liberation by secreting or holding her in a place she was unlikely to be found.**

Here, the indictment and jury charge limited the State's theory on abduction to "secreting or holding [K.R.] in a place where she was not likely to be found." Appellant argues that the State did not demonstrate "abduction" beyond a reasonable doubt because appellant basically took K.R. "wherever she wanted to go," placed her in the driver's seat, and went to a location where even at night they encountered several passing vehicles. Appellant also argues K.R.'s behavior was inconsistent with "abduction" because she accepted another ride earlier that night, asked appellant for money to make a phone call, K.R.'s artificial nails were unbroken, and K.R. could not describe or remember various details of her attack. We conclude a rational jury reasonably could have found that appellant intended to prevent K.R.'s liberation by secreting or holding her in a place she was unlikely to be found.

As indicated above, secreting or holding another where she is unlikely to be found is part of the mens rea requirement of the offense—not the actus reus. *Laster*, 275 S.W.3d at 521; *Kenny v. State*, 292 S.W.3d 89, 95 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (citing *Brimage v. State*, 918 S.W.2d 466, 475–76 (Tex. Crim. App. 1994)). Thus, the State is not required to prove that the defendant actually secreted or held another, but instead must prove that the defendant restrained another with the specific intent to prevent liberation by secreting or holding the person. *Laster*, 275 S.W.3d at 521. "The offense of kidnapping is legally completed when the defendant, at any time during the restraint, forms the intent to prevent liberation by secreting or holding another in a place unlikely to be found." *Id.*; *Kenny*, 292 S.W.3d at 95. "Intent can be inferred from an accused's conduct, remarks, and the surrounding circumstances." *Kenny*,

13

292 S.W.3d at 95. Intent to prevent liberation by secreting or holding can be inferred when a victim is held in "an automobile being driven on city streets." *See, e.g., Sanders v. State*, 605 S.W.2d 612, 614 (Tex. Crim. App. 1980). "[T]hat the abduction took place in public does not preclude a jury from concluding appellant intended to secret[e] or hold the victim in place where she was not likely to be found." *Megas v. State*, 68 S.W.3d 234, 241 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). Keeping a victim "isolated from anyone who might have been of assistance meets the element of secreting or holding in a place where the victim is not likely to be found." *Id.* at 240 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd); *see also Cortez v. State*, 738 S.W.2d 372, 374 (Tex. App.—Corpus Christi 1987, no pet.) ("[T]hreats not to "say anything" were simply the manner in which the appellant created an environment in which the complainant was not likely to be "found"; she was effectively, if not physically, 'isolated' by force of threats from anyone who could have been of assistance."). And there is no requirement that the defendant intend to secrete or hold the victim for any minimum length of time. *See Sanders*, 605 S.W.2d at 614.

Therefore, we must determine whether the evidence is legally sufficient to prove that appellant intended to take K.R. to a place she was unlikely to be found, not that he actually accomplished his purpose. *See King v. State*, 961 S.W.2d 691, 694 (Tex. App.—Austin 1998, pet. ref'd). The evidence here supports that conclusion. Appellant, a total stranger to K.R., physically grabbed and took her from outside a store near the Seawall and began speeding down the street with her in his car. When K.R. attempted to escape from appellant's car and attempted to alert another driver that she needed help, appellant forcibly returned K.R. to the car and continued driving to the beach. Appellant screamed at K.R. when she attempted to stop his car. They arrived at an area of the beach that was "very dark"

14

at close to 4:00 a.m.  According to K.R., she did not know where she was and there was no one else around.  Appellant removed K.R.'s clothes against her will and "abused" and "took advantage" of her.  Afterward, appellant threatened to kill her so she would not "say anything," forced her to assist him with freeing his car, and ordered her not to tell the police anything.

Only appellant insists that he took K.R. where she wanted to go; K.R. testified she did not want to get in or return to appellant's vehicle, twice tried to escape, and twice attempted to get help.  Indeed, appellant forced K.R. back into his car at the red light.  *See Megas*, 68 S.W.3d at 240 (concluding that appellant's forcing victim back into car during escape attempt supports intent).  Only appellant insists that he allowed K.R. to drive.  K.R. testified that appellant placed her in the driver seat and she only "drove" after appellant high-centered his car and forced her into the car to provide him assistance.  Only appellant insists that K.R. asked him for money; K.R. specifically denied this at trial.  Moreover, that the abduction took place as appellant was driving down the Seawall and later at a public area of the beach, and that cars happened to pass by, does not negate appellant's intent to take K.R. to a place she was not likely to be found.  *See id.* at 241 (concluding intent element met even where "incident took place on a well-traveled urban highway").  K.R.'s testimony supports that appellant may not have expected anyone to find them on the beach.  Appellant appeared startled by the traffic; he stopped the sexual act because "[c]ars were passing by" and he stopped leading K.R. to the water's edge because "[a] car passed by."  Nor does the fact that K.R. voluntarily accepted another ride earlier that night negate appellant's intent.  *See id.* (concluding intent element met despite victim's initial, voluntary acceptance of ride from appellant).  Finally, notwithstanding any lack of specific details, K.R. did not equivocate regarding essential facts and provided consistent statements to

15

police, the paramedic, and the SANE regarding where appellant took her and what he did to her.

From all of this evidence, viewed in the light most favorable to the verdict, we conclude that a rational jury reasonably could have inferred, beyond a reasonable doubt, appellant's intent to prevent K.R.'s liberation by secreting or hiding her in a place she was unlikely to be found. *See* TEX. PENAL CODE ANN. § 20.01(2)(A); *King*, 961 S.W.2d at 694 (concluding that evidence was legally sufficient to satisfy secreting or holding element of abduction in aggravated kidnapping case where suspect took total stranger from "highly visible area to less conspicuous alley" around 2:00 or 3:00 a.m., and attempted to forcibly kiss her).

### 4. The evidence is legally sufficient to show that appellant intended to violate or sexually abuse K.R.

Appellant essentially argues that the evidence is legally insufficient to prove appellant's intent to sexually assault K.R. because from the evidence presented no rational jury could have concluded that anything but consensual sex occurred. In support, appellant again points to K.R.'s "crude overture" in asking appellant, "Do you want to f**k me?" on the Seawall, and K.R.'s equivocal testimony regarding her memory of the degree of force used by appellant, not remembering her shorts coming off, and not "believing" that she had guided appellant's penis into her vagina or touched his penis. Appellant also notes the lack of forensic evidence of K.R.'s "putting up a fight," such as broken fingernails. We conclude that a rational jury reasonably could have inferred, beyond a reasonable doubt, appellant's intent to violate or sexually abuse K.R.

In determining whether the State has proven aggravated kidnapping, the inquiry is whether the evidence is sufficient to prove that appellant abducted K.R. with the specific intent to commit the alleged aggravating element of violating or

16

sexually abusing her. *See White v. State*, 702 S.W.2d 293, 294 (Tex. App.—Amarillo 1985, no pet.). Intent to sexually abuse a victim may be inferred from the defendant's acts and remarks, and from the surrounding circumstances. *See id.* (concluding that evidence was sufficient for jury to find intent to commit sexual abuse where appellant took complainant at gunpoint into room with only a mattress, ordered her to remove her pants, responded to her assertion that she would not permit him to rape her by asking her if she thought he was joking, showed her bullets in gun, and pursued her when she ran from him). "Any admissible evidence that reveals the intent to [violate or sexually abuse the victim] will support the verdict." *Id.* at 295. And "[t]he victim's testimony that [s]he was abused sexually is sufficient to show appellant's intent." *Kemple v. State*, 725 S.W.2d 483, 485 (Tex. App.—Corpus Christi 1987, no pet.); *see Goudeau v. State*, 788 S.W.2d 431, 435 (Tex. App.—Houston [1st Dist.] 1990, no pet.).

Again, appellant relies on K.R.'s alleged proposition of appellant on the Seawall. However, K.R. specifically testified she did not say anything initially to appellant and only responded that she was "okay" after appellant asked her. Thus, appellant's testimony does not stand uncontradicted or unrebutted. With regard to the lack of specific details provided by K.R. about the sexual assault, the SANE provided a possible explanation; in her opinion, the level of details provided would depend on the sexual assault victim's "coping skills and how well [she] deals with the trauma." The paramedic also indicated that gathering details from a victim who has undergone something traumatic—such as a sexual assault or rape—can be difficult, and in this case, the difficulty was increased due to K.R.'s language barrier.

Further, throughout trial, appellant presented to the jury his defensive theory that K.R. consented to the sexual intercourse and then only later "cried wolf"

because she was "caught in the act." However, several State witnesses testified about their observations of K.R.'s highly emotional, upset, and distraught state at the scene. Moreover, Chambers assessed that, based on his observations of K.R. when he and Weems arrived, "[s]he didn't seem like she was caught doing something she shouldn't have been doing. That's not it. She was terrified." Another police officer who responded to the 9-1-1 call testified that, based on his observations of K.R., she was "exhibiting signs of being more of a traumatic event than someone that's been caught in the act." While there is no requirement that a victim's testimony be corroborated by medical testimony or by other physical evidence,[5] the forensic evidence here is consistent with K.R.'s testimony that appellant forcibly penetrated her vagina with his penis. That is, sperm matched to appellant to a reasonable scientific certainty was located in K.R.'s vagina, and during K.R.'s vaginal exam, the SANE noted redness that could have been caused by trauma. With regard to the lack of forensic evidence of K.R.'s "putting up a fight," the SANE explained that, in her experience, some sexual assault victims do not "put up a fight" and therefore present with "little injury."

Reviewing all the evidence in the light most favorable to the verdict, a rational jury reasonably could have inferred, beyond a reasonable doubt, that appellant abducted K.R. with the intent to violate or sexually abuse K.R., thus rejecting appellant's defensive theory that the sexual act was consensual. *See* TEX. PENAL CODE ANN. § 20.04(a)(4); *see also Evans v. State*, 202 S.W.3d 158, 165 n.27 ("[I]t is the jury, not the reviewing court, that chooses between alternate reasonable inferences."). Therefore, we overrule appellant's legal insufficiency issue.

---

[5] *See Goudeau*, 788 S.W.2d at 435; *Kemple*, 725 S.W.2d at 485.

## B. Factual insufficiency of the evidence

Appellant acknowledges that a majority of the judges of the Court of Criminal Appeals have determined "the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (Hervey, J., joined by Keller, P.J., Keasler, and Cochran, J.J.); *id.* at 912–15 (Cochran, J., concurring, joined by Womack, J.) (same conclusion as plurality). Appellant nevertheless argues that the evidence is factually insufficient to support his conviction for aggravated kidnapping.

We do not depart from the dictates of *Brooks*, and we thus overrule appellant's second issue.

## C. Translation of K.R.'s testimony

In his fourth issue,[6] appellant argues that the trial court erred by permitting the interpreter to translate K.R.'s testimony without first complying on the record with article 38.30 of the Texas Code of Criminal Procedure and Texas Rule of Evidence 604,[7] which violated appellant's confrontation clause rights. We conclude that no inadequacy in the interpretation violated appellant's confrontation clause rights or rendered his trial fundamentally unfair, and the trial court committed no abuse of discretion.

The confrontation clauses of the Sixth Amendment and article I, section 10,

---

[6] We address appellant's fourth and fifth issues before his third issue because reversible error would result in remand of the entire case instead of only remand for a new punishment trial.

[7] TEX. R. EVID. 604 ("An interpreter is subject to the provisions of these rules relating to qualification as an expert and the administration of an oath or affirmation to make a true translation.").

19

of the Texas Constitution require providing an interpreter to an accused who does not understand English. *Baltierra v. State*, 586 S.W.2d 553, 556–59 (Tex. Crim. App. 1979) ("In the absence of the opportunity to be aware of the proceedings and the testimony of the witnesses against her, appellant was denied the constitutional right of confrontation . . . ."). Article 38.30 provides, in pertinent part:

> When a motion for appointment of an interpreter is filed by any party or on motion of the court, in any criminal proceeding, it is determined that a person charged or a witness does not understand and speak the English language, an interpreter must be sworn to interpret for the person charged or the witness. Any person may be subpoenaed, attached or recognized in any criminal action or proceeding, to appear before the proper judge or court to act as interpreter therein, under the same rules and penalties as are provided for witnesses.

TEX. CRIM. PROC. CODE ANN. art. 38.30(a) (West 2011). Article 38.30 applies not only to defendants, but also to witnesses who do not understand and speak English. *Id.* "[Article 38.30] protects the defendant's right to confrontation under the state and federal constitutions." *Montoya v. State*, 811 S.W.2d 671, 673 (Tex. App.— Corpus Christi 1991, no pet.). The Court of Criminal Appeals has held that a defendant's right to an interpreter must be implemented unless expressly waived if the trial judge is aware that the defendant has difficulty understanding the English language. *Garcia v. State*, 149 S.W.3d 135, 144–45 (Tex. Crim. App. 2004). Our sister court likewise has concluded that the appointment of an interpreter for a material witness is required by the confrontation clause and by article I, section 10, and must be implemented unless expressly waived if the trial judge is aware that the witness has difficulty understanding the English language. *Miller v. State*, 177 S.W.3d 1, 5–6 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

In *Linton v. State*, which involved article 38.31—the analogous statute implementing the federal and state constitutional rights of confrontation in the

context of deaf defendants and witnesses—the Court of Criminal Appeals considered the question of "how much discretion . . . the trial court ha[s] in handling the issue of interpretive services." 275 S.W.3d 493, 501–02 (Tex. Crim. App. 2009). The *Linton* Court agreed with "the many courts addressing foreign language and deaf interpretation, that decisions regarding interpretive services are within the sound discretion of the trial court." *Id.* at 503; *see also id.* at 500 ("[T]he trial judge—having the defendant [or witness] in his presence, observing his level of comprehension, and asking him questions, has wide discretion in determining the adequacy of interpretive services."). Thus, we only may reverse a trial court that has clearly abused its discretion. *Id.* at 503. "The ultimate question is whether any inadequacy in the interpretation made the trial 'fundamentally unfair.'" *Id.* (quoting *United States v. Huang*, 960 F.2d 1128, 1136 (2d Cir. 1992)).

Here, the record indicates that the complaining witness K.R.'s primary language is Spanish and that her command of English is limited. A Spanish-speaking interpreter, expressly listed in the "appearances" section of the reporter's record, was sworn prior to K.R.'s testimony. The record also indicates that K.R. "testified through the duly-sworn interpreter." Although appellant attributes to the interpreter one improper use of a preposition and K.R.'s inability to remember specific details about the sexual assault, nothing indicates that these alleged "inaccuracies" constituted anything but a direct translation of K.R.'s testimony. There were no objections at trial to the quality of the interpretation. Nothing would have alerted the trial judge to any inadequacy in the interpretation. The examination and cross-examination went smoothly with limited requests for repeating or clarifying a question or an answer. K.R. understands and speaks some English but felt more comfortable with an interpreter. K.R. never indicated any

21

problem with the interpretation. The interpreter never alerted the judge that there was any difficulty in interpretation. Not only does nothing in the record support appellant's position that the interpreter or her interpretation was inadequate, but also appellant has failed to explain how any inadequacy prevented him from confronting K.R. or ultimately led to a fundamentally unfair trial. *See id.* at 509; *Montoya*, 811 S.W.2d at 673. Under these circumstances, we cannot say that the interpretation was "constitutionally insufficient" or that the trial court abused its discretion in providing the interpreter. *See Linton*, 275 S.W.3d at 502–03, 509.

## D. Admission of the 9-1-1 call

In his fifth issue, appellant argues that the trial court erred in overruling his hearsay and confrontation clause objections and admitting the 9-1-1 call. We conclude that the State offered and the trial court admitted the 9-1-1 call for the non-hearsay purpose of showing the basis for the response by police, which does not implicate appellant's confrontation clause rights and therefore was properly admissible.

The Sixth Amendment protects an accused's right to be confronted with the witnesses against him in all criminal prosecutions. U.S. CONST. amend. VI. In *Crawford v. Washington*, the Supreme Court held this to mean that the admission at trial of a testimonial, out-of-court statement is barred by the confrontation clause, unless the defendant has had a prior opportunity to examine the witness and the witness is unavailable to testify. 541 U.S. 36, 68 (2004). Hearsay—an out-of-court statement offered in evidence to prove the truth of the matter asserted—may be admissible under the evidentiary rules. *See* TEX. R. EVID. 801(d). But hearsay statements nevertheless must overcome the confrontation clause bar, which may be implicated if the defendant is not afforded the opportunity to confront the out-of-court declarant. *Shuffield v. State*, 189 S.W.3d 782, 790 (Tex. Crim. App. 2006).

22

However, statements that are properly offered and admitted not to prove the truth of the matter, but rather for a non-hearsay purpose do not implicate confrontation clause rights and are admissible under *Crawford*. *See Del Carmen Hernandez v. State*, 273 S.W.3d 685, 688–89 (Tex. Crim. App. 2008) (concluding such where co-defendant's statement to police was offered and admitted as non-hearsay to impeach co-defendant's credibility). When a statement is "offered to show the reason for the [police's] actions," and not for the truth of the matter asserted, it is not hearsay. *Kimball v. State*, 24 S.W.3d 555, 564–65 (Tex. App.—Waco 2000, no pet.) (concluding that officer's testimony as to out-of-court conversations between officer and police dispatcher regarding conversation between unknown motorist and 9-1-1 operator regarding possible DWI was non-hearsay and its admission did not violate confrontation clause).

As with most evidentiary rulings, we review a trial court's determination that a statement is admissible as non-hearsay only for an abuse of discretion. *See Hammons v. State*, 239 S.W.3d 798, 806 (Tex. Crim. App. 2007); *Shuffield*, 189 S.W.3d at 793. Where the trial court's decision falls within the bounds of reasonable disagreement, we do not disturb its ruling. *Shuffield*, 189 S.W.3d at 793.

At trial, appellant objected to admission of the 9-1-1 call:

[Defense counsel]: Your Honor, the only objection I have to this is that it's hearsay. And I have no objection for it to be admitted for the limited purpose of it being a statement not designed to establish a fact, but it's a statement of present circumstances. It's hearsay in that the caller is not here to cross-examine under the Sixth Amendment.

. . .

[Prosecutor]: Your Honor, as you know, an exception to the hearsay rule is that we're going to offer this not for the truth of the matter asserted, but it goes to show that these officers such as Sergeant

Weems testified before us responded to an incident and it shows why they responded in the manner in which they did and how they proceeded from that point in time.

THE COURT: All right. Then State's Exhibit 15 is admitted.

(State's Exhibit No. 15 admitted)

THE COURT: And, ladies and gentlemen of the jury, I'll just instruct you that the contents of State's 15 is not being admitted to prove the truth of the matter, the statements in the tape.

Because appellant specifically objected to the 9-1-1 call as hearsay and on the basis of "the caller is not here to cross-examine under the Sixth Amendment," we conclude that appellant sufficiently preserved error. *See* TEX R. APP. P. 33.1(a)(1)(A); *Reyna v. State*, 168 S.W.3d 173, 179–80 (Tex. Crim. App. 2005).[8] However, the record indicates that appellant did not so object if the 9-1-1 call was admitted as non-hearsay. The State explained that it was offering the 9-1-1 call "not for the truth of the matter asserted"—the truth of what the 9-1-1 caller stated—but instead to provide the basis for "why [police] responded in the manner in which they did and how they proceeded from that point in time." *See Kimball*, 24 S.W.3d at 564. Further, the trial court specifically instructed the jury that it was not to consider the contents of the 9-1-1 call for "the truth of the matter," and appellant did not object to this limiting instruction.

Because the 9-1-1 call was properly offered and admitted, not to prove the truth of the matter—that appellant committed aggravated kidnapping—but rather for the non-hearsay purpose of explaining how and why police responded to the Stewart Beach area, the statement was not hearsay, did not implicate appellant's

---

[8] On appeal, appellant contends that admitting the 9-1-1 call also violated the confrontation clause found in article I, section 10, of the Texas Constitution. However, not only did appellant not object in the trial court on this basis, but also because appellant "provides argument and authority under only the United States Constitution, he has forfeited consideration of th[is] point[] of error under the Texas Constitution." *See Shuffield*, 189 S.W.3d at 788.

24

confrontation clause rights, and was admissible under *Crawford*. *See Del Carmen Hernandez*, 273 S.W.3d at 689; *see also Kimball*, 24 S.W.3d at 564-65 (concluding that trial court committed no hearsay and no confrontation clause violations).[9] Under these circumstances, we cannot conclude that the trial court abused its discretion, and we overrule appellant's fifth issue.

## E. Refusal to instruct jury on "safe place" punishment defense

Finally, in his third issue, appellant argues that the trial court erred by not including a "safe place" release instruction in the punishment jury charge. Appellant insists that he was entitled to the instruction because he gave K.R. his car keys and let her drive, K.R. returned to appellant's car after the white SUV left, and appellant did not prevent K.R. from approaching the occupants of the white SUV or the police. We conclude that the evidence failed to raise the defensive issue of "safe place" release and, therefore, the trial court did not err in refusing appellant's requested instruction.

Aggravated kidnapping is a felony of the first degree unless a defendant raises and proves the issue of whether he voluntarily released the victim in a safe place by a preponderance of the evidence; if so, then aggravated kidnapping is a second-degree felony. TEX. PENAL CODE ANN. § 20.04(c) & (d). In order to raise

---

[9] We further note that appellant failed to object when three different officers testified regarding what the police dispatcher relayed over the radio regarding the 9-1-1 call:

- [Dispatch] mentioned that a woman was dragged off—an eyewitness saw a female dragged off to a car, thrown in a car and left in an unknown direction.

- [I]t was a female in distress call.

- We got a call of a possible abduction. A witness saw a male subject grab a female subject around Comfort Inn there at the Seawall, where Seawall and Broadway, somewhere in that general area.

Nor was any limiting instruction requested or provided. "With this evidence coming in without objection or limitation, it became part of the general evidence in the case, and the jury could have used it for any purpose." *Klein v. State*, 273 S.W.3d 297, 318 (Tex. Crim. App. 2008).

25

the issue of voluntary release to a safe place, a defendant must offer some evidence that he actually released the victim. *LaHood v. State*, 171 S.W.3d 613, 624–25 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd); *see Ballard v. State*, 161 S.W.3d 269, 273 (Tex. App.—Texarkana 2005) ("[T]he application of Section 20.04(d) should focus on whether the defendant performed an act of release . . . ."), *aff'd*, 193 S.W.3d 916 (Tex. Crim. App. 2006); *Harrell v. State*, 65 S.W.3d 768, 772 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) ("Appellant, in order to avail himself of the mitigating effect of section 20.04(d), must first have performed 'some overt and affirmative act' which brought home to his victim that she had been 'fully released from captivity.'") (quoting in part *Wiley v. State*, 820 S.W.2d 401, 411 (Tex. App.—Beaumont 1991, no pet.)). In addition, to be voluntary, the release must not have been occasioned by rescue or escape. *LaHood*, 171 S.W.3d at 624 n.5 (citing *Brown v. State*, 98 S.W.3d 180, 183–88 (Tex. Crim. App. 2003)). Factors relevant to determining whether the place of release can be considered safe include: (1) the remoteness of the location; (2) the proximity of authorities or persons who could assist the victim; (3) the time of day; (4) climatic conditions; (5) the condition of the victim; (6) the character of the location; and (7) the victim's familiarity with the location. *Id.* (citing *Nolan v. State*, 102 S.W.3d 231, 238 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd)).

A defendant is entitled to an instruction on every defensive issue raised by the evidence, and we review the evidence in support of the defensive issue in the light most favorable to the defense. *See Kenny*, 292 S.W.3d at 100. A defendant's testimony alone may be enough to raise a defensive issue requiring an instruction in the jury charge. *Id.* But when the evidence fails to raise a defensive issue, the trial court commits no error by refusing the requested instruction. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993).

Evidence that appellant gave the keys to K.R. and permitted her to drive does not demonstrate appellant ever actually released K.R. Appellant remained either just outside or with K.R. in his car, and no release involving K.R.'s driving the car was even possible after appellant's car became high-centered on the curb. While appellant testified that he did not physically prevent K.R. from approaching either the occupants of the white SUV or the police, and did not threaten K.R., such inaction does not reveal that appellant "performed some overt and affirmative act which brought home to [K.R.] that she had been fully released from captivity." *See Harrell*, 65 S.W.3d at 772 (internal quotation marks omitted). Moreover, the fact that K.R. was still in appellant's car, immediately went to police, and asked them for "help" when they arrived does not support that any release was voluntary. Such a release scenario is more consistent with a "rescue by the police." *See Brown*, 98 S.W.3d at 188. Finally, the evidence does not support that any release occurred in a "safe place" because appellant and K.R. were on an isolated beach, the white SUV already had driven away, it was close to 4:00 am, the area was dark with almost no visibility, and K.R. was not familiar with the area. *See Nolan*, 102 S.W.3d at 238.

Reviewing the evidence in the light most favorable to appellant, we cannot agree that he raised a defensive issue on "safe place" release and, therefore, the trial court properly refused his requested instruction. *See Muniz*, 851 S.W.2d at 254–55; *Kenny*, 292 S.W.3d at 101–02. Thus, we overrule appellant's third issue.

### III.    CONCLUSION

Accordingly, having concluded that legally sufficient evidence supports appellant's conviction for aggravated kidnapping; that no inadequacy in the interpretation of K.R.'s testimony violated appellant's confrontation rights or rendered his trial fundamentally unfair, and the trial court did not abuse its

27

discretion in providing the interpreter; that the trial court did not abuse its discretion in admitting the 9-1-1 call as non-hearsay, which does not implicate the confrontation clause; and that the trial court did not err by refusing appellant's request for a "safe place" release instruction in the punishment jury charge, we affirm the trial court's judgment.


/s/    Tracy Christopher
Justice

Panel consists of Justices Christopher, Jamison, and McCally.

Publish — TEX. R. APP. P. 47.2(b).